IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FREDERICK T. ELDER,
         Plaintiff,

vs.                                                Case No. 08-1407-JTM

J. DENNIS HERLOCKER,
         Defendant.

MEMORANDUM AND ORDER

      This is an action for legal malpractice by plaintiff Fred Elder against defendant J. Dennis Herlocker. Herlocker has moved for summary judgment. For the reasons provided herein, the defendant's motion is granted.

      Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

      In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come

forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The facts in the present action are not controverted. Of the facts submitted by Herlocker, plaintiff Elder puports to controvert only a few, and these only by supplying lengthy deposition excerpts which essentially repeat testimony cited by Herlocker. Elder also submits a short series of additional facts, but as these are either wholly unsupported by any reference to supporting evidence, or are tied to allegations in the pleadings rather than admissible evidence, they can form no part of the court's findings. *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir.1995) (only admissible evidence may be considered on motion for summary judgment).

Findings of Fact.

In 1984, Dr. Gale Elder deeded real property amounting to less than 160 acres of real property in Cowley County, Kansas, to his sons Fred and John in joint tenancy, reserving a life estate for himself and his wife. However, Gale subsequently decided to change his estate plan when he saw that Fred and John were not getting along. He asked his attorney, defendant Herlocker, to help him with a new estate plan which would give each son separate properties rather than an undivided interest. (Herlocker Dep. at 18).

On April 20, 1999, defendant Herlocker sent letters to Fred and John explaining that he represented their father, and that under Gale's "current estate plan it is necessary to get the title to the property back in his name." (Def. Exh. A-1).

Fred returned the original executed quit claim deed to the real property to Herlocker on May 15, 1999. He attached a letter stating that he had "obtained no independent legal or tax opinion as regards this transaction and I [Fred] am relying upon you [Herlocker] for all technical, legal, and tax aspects regarding this transaction; including but not limited to, the aspect of accurate/proper land description." In the same letter, Fred acknowledged that Herlocker was doing estate planning for Gale, but asked Herlocker to send to both Fred and his brother John a written opinion regarding the tax consequences of the quitclaim deed transfer. (Def. Exh. A-2). The letter also stated:

> You had previously furnished me a copy of a Quit Claim Deed dated May 22, 1984, transferring Lot 2, NE 1/4, Section 4, Township 32 South, Range 3 East to Frederick T. Elder and John David Elder. I would appreciate a copy of any similar instrument as regards E ½, SW 1/4, Section 21, Township 32 South, Range 3 East. I would appreciate receiving a written opinion from you regarding the 1999 federal and state income tax consequences of the current transaction. Further, I would appreciate receiving a written opinion from you regarding any potential Kansas Inheritance Taxes for the land as structured prior to May 1, 1999, and as structured after December 31, 1999. Since you are doing estate planning for my father, as you state in your April 22, 1999, letter, and since tax considerations are always a major part of estate plans, I am sure you have already considered these issues and reporting upon them will involve little additional legal cost.

Gale died on March 2, 2004. On March 9, 2004, John Elder petitioned for probate of Gale's will in Cowley County Probate Case No. 04-PR23-W. Fred filed an objection to the petition, through his attorney, Robert E. Barker, on April 2, 2004. In the objection, Fred alleged that the will was the product of undue influence by his brother John, and that:

> The decedent [Gale Elder] agreed that he would devise by will to Frederick T. Elder the property ... if Frederick T. Elder would re-convey the property previously gifted ... Attorney for decedent, J. Dennis Herlocker and decedent represented that this reconveyance was part of the decedent's estate plan and the said real estate would be devised by will instead.

(Def. Exh. B, at ¶ 15).

Herlocker gave a deposition in the probate case on April 28, 2005. He testified he did not believe the transfer created a contractual obligation for Gale to return any property by will:

3

> Q: The difference here – I mean, your perception of that appears to be that it was not a contractual relationship; it was just a matter of a new estate plan. Is that about right?
> A  That's right.
> Q: That would be your testimony if called.
> A: That's right.
> Q: So this was just another estate plan.
> A: That's the way Dr. Elder looked at it, and that's the way I looked at it, too.
> Q: And this was a – and this could have been changed again the next day or again the next day, because it was only an expectancy from your perspective, is that right?
> A: That's right.
> Q: So John and Fred could have only expected to, at some time, receive the property, but there was no contractual relationship at all that required Dr. Elder to will either to John or Fred, is that right?
> A: That's correct.

(Herlocker Dep. 93-94).

Herlocker testified he felt he owed no duty to inform Fred of the possible consequences of the transfer, or to advise Fred to obtain legal advice:

> Q: Okay. Well, did you ever express – did you ever wonder if maybe you ought to tell Fred about this estate plan and that, in fact, he had not been given a gift before and that dad was thinking this was just another kind of change in his estate plan and – did you ever think maybe you ought to talk to Fred about that to give him some hints as to maybe he ought to talk to an attorney about what was going on?
> A: No. The – my client just wanted something done. He wanted the – and I told him how to have it done, and that we needed to get the deeds back from his sons if – I didn't want to do anything other than what my client wanted to do. . . . .
> Q: And did that not involve – did a deed from Fred back and John back, did that not involve a fairly serious determination on their part as to whether they ought to deed that property back?
> A: I don't know. Maybe so, but certainly I – it wasn't my place to tell John or Fred, you know, what they should or shouldn't do.

(Herlocker Dep. 105-07).

Herlocker testified concerning his relationship with Fred:

> Q: But there did come a time, didn't there, when Fred became your client?
> A: Yeah, that one time when Fred asked for – it was right prior to this letter I think, when he asked for information about taxes mainly....
> Q: And he paid you a fee for your response as to what the tax effects of that transaction were.
> A: Well, actually I – after I got Fred's letter I contacted Dr. Elder and told him about the letter and said, you know, I can't respond to Fred because I'm not his attorney, and, you know, what do you want me to do?
> Q: What did he say?
> A: He said go ahead and respond to him.

4

Q: So you had an attorney-client relationship with Fred at the time of your letter that you sent to Fred.
A: Dr. Elder said that you can respond to him, but I'm not going to pay for it, so I had to bill Fred for it.
Q: So you did have – you're saying you did have an attorney-client relationship with Fred Elder before June 1 of '99, which is the date of the letter to Fred which is Exhibit 1-D.
A: Correct.
Q: And the reason you had that relationship is because – the reason you know that is because you give him advice regarding the inheritance tax liability and the income tax consequences.
A: Correct.
Q: Okay. So Fred was involved in a confidential relationship with you and with Gale, and also both of them were your clients at that time.
A: Well, I didn't consider it that way. I considered Fred, giving him that information, just as a part – whatever I do for my client, Dr. Elder, if he – if he authorized it, if any other heir has questions or comments or something when you're handling estate planning, and the – your client says go ahead and deal with them, or answer their questions, then we do.
Q: But the fact is that you had a duty – you had a duty to Fred at the time, all duties that we have with clients, to not withhold information from him, that you express in this letter, to be responsible in terms of your advice. Do you agree so far?
A: Yes.
Q: And do you believe this June 1 letter expresses to Fred everything that he needed to know in order to – in order to understand this transaction?
A: I think it expresses enough to where he would – yes, that he would need to know what was going on. He could certainly ask more questions or he could get other counsel or whatever he wanted to do, but, yes, I think it did.
Q: But wasn't it also your responsibility in this June 1 letter or prior to that time to tell him that he may be – if he signed that deed back, he may be giving up a gift?
A: No, I didn't think it was my responsibility to do that.
Q: Why not?
A: Well, because that's not what my client, Dr. Elder, envisioned or that's not what his intent – didn't even – as a I stated before, it was – Dr. Elder considered this all part of his estate plan, that he could undo whatever he did, and the fact that we're getting deeds back was just something that had to be done in order to implement his plan.
Q: But how does that fit in with your relationship, your professional relationship, with Fred at this time, too? You had a disclosure requirement to both of them, didn't you?
A: No, I don't think I did.
Q: Why not?
A: Well, I didn't consider that I represented Fred. I mean, to answer that question, the only reason I did it was because Dr. Elder said to go ahead and answer him.
Q: But Fred had asked you as attorney to give him advice, had he not?
A: On those specific questions.
Q: And your response was that you said in order to avoid a conflict between the terms of the deed and of the will it was necessary for John and you to deed your interests back to your father, and then you go on to talk about income tax consequence and inheritance tax liability, but would you agree with me you said nothing about the possibility that he would never see this property again?
A: No, I didn't say that. I didn't know that. . . . .

5

> Q: All right. So if there had been a completed gift, would it not have been important for Fred Elder to know that what he was signing might give up the gift that he had earlier gotten in 1984?
> A: Important to Fred, yes.
> Q: Well, he was your client at the time, why didn't you tell him that?
> A: I didn't consider him my client, and I was just answering the questions that he asked.

(Helocker Dep. at 108-112).

On June 6, 2005, attorney Jeffrey L. Carmichael wrote a demand letter to Herlocker which stated that Fred Elder had "asked me to investigate and advise him in issues involving legal services provided by you." (Def. Exh. A-3, at 1). Carmichael stated that Fred's "loss was a direct result of deficient and misleading legal advice provided by you both in your June 1, 1999 letter to my client, as well as in related telephone conversations" and that Herlocker had "failed to notify Frederick Elder of the conflict between his interests and those of your other clients, and you did not advise him to seek independent counsel on the matter." (Id. at 2). Carmichael stated that Fred might seek recovery from Herlocker for his loss, and that if Herlocker did not respond in ten days, "I have advised Mr. Elder of his right to legal recourse." (Id. at 3).

After receiving a letter from Herlocker, Carmichael responded with a second demand letter on June 29, 2005:

> I received your letter of June 21, 2005 regarding my client, Frederick T. Elder. In the first paragraph of your letter you indicated that you did work for Fred Elder but that 'throughout the transaction Fred, John and Gale knew that I was representing Gale.' I would appreciate receiving from you any correspondence or other materials wherein you limited your representation of Fred Elder in any fashion and for any reason. Without such limitation of your representation, I believe you owed Fred Elder a full duty of candor, disclosure and advice regarding the transactions entered into. You indicated in the second paragraph of your letter that everything you told Fred was true and while that may be a factual and accurate statement, I believe the issue that we raise is whether you gave appropriate advice and counsel to Fred regarding the effect of a transfer that was contemplated. Certainly from Fred Elder's standpoint, he relied upon you to protect his interest and advice [sic] him of the effect of that transfer and he relied upon your representations that he could get that property back at a future time. I have reviewed a copy of your deposition and I stand by the statements made in our previous correspondence. If you would like to refer this matter on to your malpractice carrier, I will be happy to discuss with them the claims against you which I believe are appropriately raised.

(Def. Exh. A-4)

6

Carmichael never attempted to obtain an agreement from Herlocker to toll the statute of limitations on any claim against Herlocker for negligence or malpractice. There is no tolling agreement.

The Complaint in the present action was filed on December 24, 2008. It alleges:

13. The Plaintiff, Frederick T. Elder, relied upon the Defendant, J. Dennis Herlocker, as an attorney, to advise him with regard to the transaction and in doing so, Defendant, J. Dennis Herlocker, was negligent and breached his obligations as a legal professional and failed in the following manner:

   a. Defendant had a conflict of interest between his clients Frederick T. Elder and Gale Elder in providing a consultation and advice on the issue of whether Plaintiff should transfer the real property back to his father.
   b. Defendant failed to advise Plaintiff, Frederick T. Elder of a potential conflict of interest in providing advice and consultation on issues related to the transfer of the real property from himself back to Gale Elder.
   c. Defendant failed to advise Plaintiff, Frederick T. Elder, of the legal consequences of transferring the real property back to Gale Elder without an assurance that the real property or equivalent value would be returned to Plaintiff in Gale Elder's future estate plans.
   d. Defendant failed to advise the Plaintiff, Frederick T. Elder, to obtain proper assurance the property or equivalent value would be returned to Plaintiff and of the legal consequences of transferring the title of the real property back to his father.
   e. Defendant failed to in any way limit his representation of Plaintiff to only tax issues.
   f. Defendant failed to advise the Plaintiff to obtain alternative legal advise [sic] regarding the potential effect of transfer of title to the real property.

(Dkt. No. 1 at ¶ 13).

Conclusions of Law.

In defending against Fred's claim of legal malpractice, Herlocker argues both that any representation he had of Fred was limited to advice on the tax consequences of the quitclaim deed, pursuant to Fred's May 15, 1999 letter, and that Fred in any event suffered no injury since he had already executed the quit-claim deed before the alleged attorney-client relationship ever existed. The present summary judgment motion, however, rests on a separate defense – that Fred's claim is time-barred by the general tort statute of limitations, K.S.A. 60-513(a). Thus, for purposes of the present motion, the court assumes that a lawyer-client relationship existed between Fred Elder and

Herlocker, that Fred's claims of fault are true, and that these led to his injury. The question here is, when did the statute of limitations begin to run?

The answer, under the uncontroverted facts set forth above, is that the state began to run in mid-2005, at which time the plaintiff knew, based on defendant Herlocker's probate deposition, that Herlocker denied the existence of any general attorney-client relationship and specifically denied the existence of any contractual obligation to devise any property to Fred. The demand letters sent by Fred's counsel in June of 2005, which explicitly advance charges of malpractice against Herlocker, also demonstrate that it was reasonably ascertainable at that time that a legal malpractice claim existed.

Under Kansas law, a claim of legal malpractice may be considered either a contract claim or a tort claim, depending on the origin of the duty which was allegedly violated by counsel. "Where the act complained of is a breach of specific terms of the contract without any reference to the legal duties imposed by law upon the relationship created thereby, the action is contractual. Where the essential claim of the action is a breach of a duty imposed by law upon the relationship of attorney/client and not of the contract itself, the action is in tort." *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 87, 716 P.2d 575 (1986) (*citing Bowman v. Doherty*, 235 Kan. 870, 686 P.2d 112 (1984)). Here, the plaintiff's claim is essentially that defendant Herlocker violated a duty imposed by law to inform him of the consequences of the quit-claim deed, and as a result his action sounds generally in tort.

In *Pancake House*, the Kansas Supreme Court noted that "[d]epending on the facts and circumstances of each case," any of four different legal theories may govern when a claim for legal malpractice accrues:

> (1) The occurrence rule – the statute begins to run at the occurrence of the lawyer's negligent act or omission.
> (2) The damage rule – the client does not accrue a cause of action for malpractice until he suffers appreciable harm or actual damage as a consequence of his lawyer's conduct.
> (3) The discovery rule – the statute does not begin to run until the client discovers, or reasonably should have discovered, the material facts essential to his cause of action against the attorney.

> (4) The continuous representation rule – the client's cause of action does not accrue until the attorney-client relationship is terminated.

239 Kan. at 87. *See Reich v. Braun*, No. 90-CV-1006, 1993 WL 33877, *6 (10th Cir. 1993)

Here, there is no claim of continuous representation after 1999. And application of the "occurrence rule" would bar the plaintiff's claim, as the alleged failure to give full advice also happened in 1999. The discovery rule would also preclude recovery. As noted above, the alleged malpractice was reasonably discoverable in 2004, when the plaintiff's father died and plaintiff discovered that he received no real property by the latest will. Plaintiff commenced his probate challenge in 2004, advancing the theory that he had contracted for an award of real property. The subsequent deposition of the defendant Herlocker in April of 2005, in which he explicitly denied the existence of any general attorney-client relationship with Fred Elder, and disavowed the existence of any contract-for-will, made manifest the existence of the plaintiff's current claim  The June, 2005 letters by plaintiff's counsel which threatened an action for malpractice further establish that plaintiff's claim was reasonably discoverable more than two years before the present action was filed in 2008. As a result, the present action is timely if – and only if – Kansas law would choose to apply the "damage rule" identified in *Pancake House*.

Kansas law precludes such a result. As a general rule, Kansas law holds that a claim for legal malpractice will not begin until the underlying litigation is resolved. *Pizel v. Zuspann*, 247 Kan. 54, 77, 795 P.2d 42 (1990). However, Kansas law provides an exception to this general rule where it was reasonably clear an injury has arisen through legal malpractice. *Dearborn Animal Clinic, P.A. v. Wilson*, 248 Kan. 257, 806 P.2d 997(1991).

In *Dearborn Animal Clinic*, an action by the owners of a veterinary clinic against the attorney who drafted a stock purchase agreement, the court acknowledged the rule requiring completion of the underlying litigation as "the better rule, and the one which generally will be applicable," but stressed that the rule was not universal:

> Ordinarily, as long as there is a good faith dispute, a layperson could not reasonably be expected to know that the dispute was caused by his attorney's negligence and the mere filing of an underlying lawsuit would not automatically trigger the running of

> the statute but would usually require a final determination of such an action. However, the rule that the underlying litigation must be finally determined before the statute of limitations begins to run cannot be arbitrarily applied in every case. If it is clear that the plaintiff in a potential legal malpractice action has incurred injury and if it is reasonably ascertainable that such injury was the result of the defendant attorney's negligence, then under K.S.A. 60-513(b) the statute begins to run at the time that it is reasonably ascertainable that the injury was caused by the attorney's malpractice even though the underlying action may not have been finally resolved.

248 Kan. at 270.

The trial court had concluded that the action was time-barred, and the limitations period began when the plaintiffs first sued to enforce a stock purchase agreement against the putative buyer. The plaintiffs appealed, arguing that

> their cause of action did not accrue until their suit against [the buyer] Holenbeck was resolved against them, March 9, 1987, because this was the point in time in which they actually incurred damages or had actual knowledge of the fact of injury and thus could legally maintain an action against [attorney] Wilson. If they had been successful in the underlying litigation with Holenbeck, they would have had no damages attributable to Wilson. To hold that the cause of action accrues before the underlying litigation is resolved, plaintiffs contend, would be to require them to file their malpractice suit contemporaneously with their suit against Holenbeck.

*Id.* at 262.

Applying the exception to general rule, the court reached the same result as the trial court, although the court held that the limitations period began to run not when the suit against Holenbeck was first begun, but when one of the plaintiffs, Dr. Stewart, acknowledged in an interrogatory that agreement drafted by the defendant attorney did not provide for the result the plaintiffs intended. *Id*. at 271.

> In the instant case the plaintiffs clearly suffered monetary damage when they had to retain counsel to enforce their interpretation of the contract and when Holenbeck reduced his payments and refused to purchase stock in Central. Further monetary damage was incurred in February 1986 when Holenbeck ceased making any payments to Central because of the lawsuit filed against him....
> The meager record before us makes it abundantly clear that at the time Dr. Stewart answered the interrogatories on behalf of Dearborn, on June 12, 1986, the Dearborn officers and stockholders knew that the Dearborn/Holenbeck agreement contained only an option for the Central stock and not a requirement that Holenbeck purchase the stock. Dr. Stewart, in her deposition taken after the interrogatories had been answered, testified that at the time the interrogatory answers were signed, it had become obvious to these plaintiffs that the agreement contained only an option for Holenbeck to purchase the Central stock.

*Id.* at 270-71.

This court reached a similar result in *Newland v. First National Bank in Goodland*, No. 91-1443-PFK, 1994 WL 476330 (D. Kan. Aug. 24, 1994), *aff'd*, 82 F.3d 338 (10th Cir. 1996). In that case, applying *Dearborn Animal Clinic*, the court concluded that the legal malpractice claims of the plaintiff, a lost heir who first appeared after the distribution of the estate, were time-barred, even though the probate proceedings continued into the limitations period.

> In the present case, it is uncontroverted that Newland actively contemplated a negligence action against the defendants from the time of his first appearance in the probate proceedings, when the estate had been distributed to his father's siblings. Any alleged wrongful conduct, and any injury to the plaintiff, was reasonably apparent by that time.

*Id.* at *6. *See also Reich v. Braun*, 1993 WL 33877, at *8 (applying *Dearborn* and holding that limitations period for legal malpractice begins "if it is clear that the plaintiff ... has incurred an injury, and if it is reasonably ascertainable that such injury was the result of the attorney's negligence ... even though the underlying action may not have been finally determined").

IT IS ACCORDINGLY ORDERED this 26th day of June, 2009 that the defendant's Motion for Summary Judgment (Dkt. No. 12) is hereby granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE